# In the United States Court of Federal Claims

<table>
<tr><td>

CRESTVIEW CLINICAL
LABORATORY, LLC,

          Plaintiff,

   v.

 THE UNITED STATES,

          Defendant.

</td><td>

No. 24-cv-0995
(Filed:  April 24, 2026)

</td></tr>
</table>

Elaine F. Harwell, Procopio Cory Hargreaves & Savitch LLP, San Diego, CA, for Plaintiff.

Galina I. Fomenkova, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  Also on the briefs were Brett A. Shumate, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Corinne A. Niosi, Assistant Director.

## OPINION AND ORDER

Meriweather, Judge.

      In this breach-of-contract action, Plaintiff Crestview Clinical Laboratory, LLC ("Crestview") seeks damages in the amount of $69 million from the United States for testing services furnished during the COVID-19 pandemic.  Crestview alleges, *inter alia*, that the U.S. Department of Health and Human Services ("HHS") and the Human Resources and Services Administration ("HRSA") breached an express or implied-in-fact contract and otherwise acted in bad faith by pausing and reversing reimbursements obligated to Crestview pursuant to the COVID-19 Uninsured Program ("UIP").  The United States filed a Motion to Dismiss, ECF No. 12, contending that Crestview has failed to identify a money-mandating statute or plausibly allege a contract with the United States from which this Court could derive jurisdiction.  Having reviewed the pleadings, the parties' briefing,[1] and the relevant law, and for the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** the United States' Motion to Dismiss.

---

[1] The following filings are relevant to this Opinion: Compl., ECF No. 1; Def.'s Mot. to Dismiss, ECF No. 12 ("Mot."); App'x to Def.'s Mot. to Dismiss, ECF No. 12-1 ("App'x"); Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 15 ("Resp."); Def.'s Reply in Support, ECF No. 16 ("Reply").  Throughout, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

**BACKGROUND**[2]

**I.**      **Factual Background**

    **A.**      **<u>The COVID-19 Uninsured Program Was Established to Reimburse</u>**
        **<u>Healthcare Providers for Eligible Services to Uninsured Individuals.</u>**

       The COVID-19 pandemic in 2020 placed an unprecedented strain on the global economy and healthcare workers. *See* Compl. ¶¶ 1–4. To better respond to this complicated health crisis, government officials sought ways to significantly expand COVID-19 testing capacity. *See id.* ¶ 5. On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which appropriated $100 billion in funding and entrusted the Secretary of HHS with "reimburs[ing] through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 281, 563 (2020). In conjunction with the CARES Act, Congress approved additional COVID-19 relief funds through the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020), the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020), and the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) (collectively "UIP Funding Laws"). *See* Compl. ¶¶ 7–9. Through the UIP Funding Laws, Congress expressly appropriated $2 billion toward claim reimbursement for testing services provided to uninsured individuals, although HHS later allocated additional general funds for that purpose. *See* App'x at A2–A3, A6.

       Contemporaneously with the CARES Act, HHS established the COVID-19 UIP as a framework to encourage and support testing, treatment, and vaccination services for uninsured individuals. *See* Compl. ¶ 9. Using the appropriations made available through the UIP Funding Laws, HHS created a fund to reimburse healthcare providers who voluntarily participated in the program. *See id.* ¶¶ 7–9. HRSA, the operating division within HHS charged with administering the COVID-19 UIP, contracted with UnitedHealth Group ("UnitedHealth") to process UIP claims. *See id.* ¶¶ 22, 26; App'x at A3. To submit claims for reimbursement, a healthcare provider had to first enroll through an online portal. *See* App'x at A18–A19, A26–A27, A42–A50. Once enrolled, a healthcare provider could submit claims for rendered services on a rolling basis, which required a patient roster and attestation that the provider complied with the requisite UIP Terms and Conditions ("T&C") for every claim submission. *See id.* at A49, A51–A55. The UIP T&C imposed various record-keeping and other obligations on UIP participants. *See*

---

      [2] As the instant case is at the motion-to-dismiss stage, this Opinion recites and assumes the truth of the factual allegations in the Complaint. *See Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018). Courts may also rely on any exhibits attached to a motion to dismiss that are "incorporated by reference or integral to the claim." *Cotter Corp., N.S.L. v. United States*, 127 F.4th 1353, 1366 (Fed. Cir. 2025) (quotation omitted). The United States attaches a 137-page Appendix to its Motion consisting of nine exhibits. *See* Mot. at v (index). Crestview only objects to two exhibits. *See* Resp. at 10; App'x at A104–A137. Crestview does not ask the Court to exclude the remaining exhibits from consideration—indeed, Crestview cites some of those exhibits multiple times in its opposition. *See, e.g.*, Resp. at 6–7, 13, 27–28. As explained further below, the Court also relies on certain portions of the uncontested Appendix.

2

*generally id.* at A63–A97.  "Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payments made." *Id*. at A76.[3]  In exchange for services provided, the UIP T&C state: "The Secretary will reimburse the Recipient generally at 100 percent of Medicare rates." *Id.* at A78.  After attesting to the UIP T&C and submitting a patient roster, UnitedHealth would analyze the information to verify compliance with the UIP T&C and determine reimbursement eligibility.  *See* Compl. ¶¶ 26, 28; App'x at A35.  To assist healthcare providers with the UIP reimbursement processes, HRSA and UnitedHealth provided a "HRSA COVID-19 Claims Reimbursement" training webinar ("HRSA Webinar"), *see* App'x at A30–A62, as well as supplementary presentations (collectively "UIP Process Training"), *see* Compl. ¶ 27, while HRSA published "FAQs for COVID-19 Claims Reimbursement" ("UIP FAQs") on its official website.  *See* Compl. ¶ 49; App'x at A1–A29.

On March 22, 2022 ("Cut-Off Date"), HRSA announced that funding for COVID-19 UIP testing and treatment services had been exhausted and no claims beyond that point would be accepted.  Compl. ¶¶ 27, 32.  On June 3, 2023, Congress passed the Fiscal Responsibility Act ("FRA"), Pub. L. No. 118-5, 137 Stat. 10 (2023), which rescinded all unobligated balances of certain appropriations under the UIP Funding Laws.  *See* Compl. ¶ 14.

### B.      Crestview Participated in the COVID-19 UIP for Almost Two Years.

Crestview, a California-based healthcare provider, registered with the COVID-19 UIP on or about September 21, 2020, and provided COVID-19 testing services to uninsured individuals between October of 2020 and March of 2022.  *See id.* ¶¶ 12, 23, 29.  Crestview accepted the UIP T&C to receive reimbursements for the provision of COVID-19 testing services.  *See id.* ¶ 23.  Crestview alleges that it complied with all UIP T&C provisions, including by "obtaining patient attestations of their insured or uninsured status" and "bill[ing] a patient's third-party insurance for COVID-19 testing services where available." *Id.* ¶ 28.  Crestview also "made substantial monetary investments" to meet the COVID-19 UIP requirements.  *Id.* ¶¶ 5, 53.  In Crestview's experience, it received payments for claims on average within 19 business days after submission. *See id.* ¶ 51.  Prior to the Cut-Off Date, Crestview submitted at least $69 million in COVID-19 UIP claims for which it had not yet received reimbursement.  *See id.* ¶¶ 12, 29–31, 33.

Sometime between January 24 and January 28, 2022, "without notice, explanation or opportunity to dispute," HRSA and UnitedHealth reversed and recouped over $3.4 million from Crestview's bank accounts for COVID-19 UIP claims billed in 2021 and previously paid to Crestview.  *Id.* ¶ 30.  HHS and HRSA then allegedly paused all COVID-19 UIP reimbursements to Crestview.  *See id.* ¶¶ 13, 30–31.  On April 20, 2022, HRSA sent a letter to Crestview stating that it was "selected" for an audit ("Assessment") to assess its compliance with the UIP T&C. *Id.* ¶ 34.  HRSA contracted with a firm to conduct the Assessment and requested "records related

---

[3] Interestingly, the UIP T&C in effect after December 17, 2021, only include this language for treatment and vaccination services, not testing services.  *See* App'x at A86–A87.  In all other respects, the three versions are mostly identical.  For ease of reference, and because the parties do not distinguish between the UIP T&C versions, the Court primarily relies on the second set in effect between June 1, 2021, and December 17, 2021, *see id.* at A75–A85, which is ostensibly the timeframe during which many of Crestview's disputed claims were submitted.

to a list of 262 claims and other business records." *Id.* ¶ 35. Crestview complied with those requests and attempted to clarify the status of the paused and reversed payments, which were not part of the Assessment. *See id.* ¶¶ 36–41. Following a series of inquiries by Crestview into the nature and process of the Assessment, HRSA finally clarified on August 18, 2022, that it "instructed its contractor to pause or reverse processing" Crestview's pending claims and would "review the payment pause status" upon completion of the Assessment. *Id.* ¶ 38. HRSA further indicated that, "[i]f the payment pause is released, eligible claims may be paid, subject to the availability of funds." *Id.* Crestview continued to inquire about the Assessment, first being told results would be available by September of 2022, *see id.* ¶ 39, but the audit remained ongoing as of March 3, 2023. *See id.* ¶ 41. Between April of 2022 and October of 2023, Crestview inquired about the Assessment multiple times but received no substantive response. *See id.* ¶¶ 34–43. Crestview finally received HRSA's preliminary audit results on January 10, 2024, and the final Assessment report was issued on April 15, 2024. *See id.* ¶¶ 44–45. HHS and HRSA still have not released the payment pause. *See id.* ¶ 45.

## II.      Procedural Background

On October 10, 2023, Crestview filed a lawsuit against HHS and HRSA in the U.S. District Court for the Central District of California. *See id.* ¶ 43. Crestview primarily sought mandamus and declaratory relief, including release of the Assessment findings and payment of the withheld funds. *See id.* Crestview voluntarily dismissed its suit without prejudice on June 21, 2024, shortly after HHS and HRSA issued the final Assessment report. *See id.*

On June 27, 2024, Crestview filed the instant Complaint asserting four Counts: (1) breach of express contract, (2) breach of implied-in-fact contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) violation of money-mandating statutes and regulations to reimburse providers for COVID-19 UIP testing services. *See id.* ¶¶ 46–79. The United States has moved to dismiss Count IV—violation of a money-mandating law—for lack of subject matter jurisdiction and the others for failure to state a claim. *See* Mot. at 2. The Motion is now fully briefed and ripe for decision.

## LEGAL STANDARDS

## I.      Subject Matter Jurisdiction

When challenging jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the "[p]laintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Park Props. Assocs., L.P. v. United States*, 916 F.3d 998, 1002 (Fed. Cir. 2019). "In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018) (quotation omitted). If the relevant factual allegations are in dispute, the Court may review jurisdictional facts beyond the pleadings or order jurisdictional discovery. *See Fox Logistics & Constr. Co. v. United States*, 145 Fed. Cl. 236, 239 (2019).

## II.      Failure to State a Claim

"To withstand a motion to dismiss under Rule 12(b)(6) of the RCFC, a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This analysis is primarily focused on the factual allegations of the complaint, although courts may also look to exhibits attached to the complaint, as well as "matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (alterations omitted) (quoting 5B Wright Miller's Federal Practice and Procedure § 1357 (3d ed. 2004)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court "must presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff." *Bd. of Supervisors v. United States*, 84 F.4th 1359, 1364 (Fed. Cir. 2023) (quotation omitted).  A complaint "does not need detailed factual allegations," but the alleged facts "must be enough to raise a right to relief above the speculative level," as opposed to mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

## I.      The Court Lacks Subject Matter Jurisdiction over Count IV of the Complaint.

### A.      <u>The Court's Subject Matter Jurisdiction Is Limited.</u>

The Tucker Act gives this Court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976).  Therefore, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).  Because "the absence of a money-mandating source [is] fatal to the court's jurisdiction under the Tucker Act," a Rule 12(b)(1) dismissal is the proper remedy for failure to plead a money-mandating source. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005).

The Federal Circuit has recognized that "a statute or regulation that provides for payment of money can qualify as money-mandating if the plaintiff's claim is that the statute or regulation creates a right to payment upon a showing that the plaintiff qualifies for that payment by satisfying designated statutory or regulatory requirements." *Price v. Panetta*, 674 F.3d 1335, 1339 (Fed. Cir. 2012).  The Supreme Court's broadly stated test is "whether the source of

substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 218 (1983). If the relevant statute grants "solely discretionary payment of money," then there is no "right to recover money damages from the United States." *Adair v. United States*, 648 F.2d 1318, 1322 (Ct. Cl. 1981) (quoting *Testan*, 424 U.S. at 398); *cf. San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 480 (2019) ("Appropriation acts, by their very nature, are generally money-authorizing, not money-mandating."). Even where a statute or implementing regulation "standing alone" is not money-mandating, courts still consider whether those sources acting in combination "are fairly construed as money-mandating." *Roberts v. United States*, 745 F.3d 1158, 1167 & n.5 (Fed. Cir. 2014). However, this only extends to agency policies "akin to formal agency rules or binding written directives." *Acevedo v. United States*, 824 F.3d 1365, 1370 (Fed. Cir. 2016).

## B. Crestview Fails to Identify a Money-Mandating Statute or Regulatory Framework.

The United States moves to dismiss Count IV on the basis that Crestview has failed to identify a specific money-mandating law that would confer subject matter jurisdiction in this Court. *See* Mot. at 14. Crestview bears the burden of establishing that the Court has jurisdiction over this claim. *See Park Props.*, 916 F.3d at 1002. Crestview broadly alleges that "the UIP Funding Laws," or in the alternative, "a regulatory framework" comprised of "the UIP Funding Laws, the Terms and Conditions, UIP Process Training, UIP FAQs and guidelines and website" create a money-mandating obligation. Compl. ¶¶ 76–77. Crestview seemingly agrees that the UIP Funding Laws are not facially money-mandating statutes. *See* Resp. at 26. The Court concurs.[4] However, Crestview argues "that when a statute or regulation is interpreted concurrently with *agency guidelines and documents*, the agency can establish a framework mandating payment." *Id.* (emphasis added). Relying heavily on *Monzo v. United States*, No. 12-724C, 2013 WL 6235608 (Fed. Cl. Nov. 27, 2013), Crestview argues that "by providing the proscriptive UIP Terms and Conditions, HRSA has relinquished the discretion that the CARES Act and subsequent statutes *may have* provided." Resp. at 27 (emphasis in original). Because Crestview alleges it accepted and complied with the UIP T&C, "a contract was formed," and the United States is obligated to "fulfill its obligations under the agreement it made." *Id.* at 28–29.

Crestview's arguments are circular. As the United States points out in reply, "Crestview collapses its argument on Count IV into an 'agreement' it claims it had with the Government"— in other words, "breach of contract." Reply at 3. Even assuming the UIP FAQs and other informal UIP Process Training documents qualify as policies "akin to formal agency rules or

---

[4] Indeed, the CARES Act provided broad discretion to the Secretary of HHS in determining how "to reimburse through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." 134 Stat. at 563. There is no dispute that the UIP Funding Laws are appropriations statutes, which "by their very nature, are generally money-authorizing, not money-mandating." *San Antonio Hous. Auth.*, 143 Fed. Cl. at 480.

binding written directives," *Acevedo*, 824 F.3d at 1370,[5] Crestview fails to show how those alleged "regulations," alone or in combination, "are fairly construed as money-mandating." *Roberts*, 745 F.3d at 1167.  Instead, according to Crestview, the other documents merely "support[]" the obligation imposed by the UIP T&C to "reimburse the Recipient generally at 100 percent of Medicare rates" in exchange for checking healthcare coverage eligibility and "agree[ing] not to bill the patient," among other promises.  Resp. at 28.  Crestview pleads that it accepted those obligations to be eligible for claims reimbursement, and that the United States' obligation to reimburse flows from the UIP T&C.  *See* Compl. ¶¶ 23–24, 47, 58.  Crestview thus effectively confirms that "its claims in this case rise and fall on its breach of contract theory." Reply at 3–4.

Moreover, Crestview's reliance on *Monzo* is misplaced.  *Monzo* concerned an employee suggestion program implemented by the Social Security Administration ("SSA").  *See* 2013 WL 6235608, at *1.  Agencies are authorized by statute to create programs awarding cash bonuses to employees whose suggestions, if implemented, "contribute to the efficiency, economy, or other improvement of Government operations."  *Id.* (cleaned up) (quoting 5 U.S.C. § 4503).  The SSA further "promulgated rules for the program in its Personnel Manual for Supervisors."  *Id.*  At the outset, the *Monzo* court found "that the statute, in isolation, does not mandate the payment of money."  *Id*. at *2 (citing *Cooley v. United States*, 76 Fed. Cl. 549, 556–57 (2007)).  But the plaintiff argued that "in combination with the agency's program guidelines, the agency has relinquished the discretion afforded by the statute and created a regulatory framework under which a reward payment is mandated if certain conditions are met."  *Id.*  The *Monzo* court thus continued to examine the program, noting "the SSA's Personnel Manual for Supervisors goes into great detail in providing guidelines for determining whether to reward employee suggestions," including "limitations on what factors may be considered" and rules for "how to determine the amount of the award."  *Id.* at *3.  Although SSA retained "discretion over how much to award," the *Monzo* court concluded that SSA had no discretion over whether to award the payment if certain conditions were met.  *Id.* at *5 (noting that "SSA has bound itself to these guidelines," and where the stated "conditions are met, there should be a payment").  Thus, because "the guidelines themselves mandate payment," the *Monzo* court declined to reach the plaintiff's alternative jurisdictional basis of breach of an implied-in-fact contract.  *Id.*

The Court is unpersuaded by this unpublished opinion.  No other decisions from this Court have followed *Monzo*'s approach to analyzing informal money-mandating frameworks.[6] Instead, nearly every court to be presented with similar claims arising under employee

---

[5] The Court recently concluded that those elements of the UIP are not formally promulgated regulations or binding guidelines and thus "cannot constitute" a money mandating source of law.  *Laborant v. United States*, 180 Fed. Cl. 76, 91 (2026).

[6] The Court could only locate two published decisions citing *Monzo*, both of which involved takings claims under the Fifth Amendment; as the Takings Clause provides a source of jurisdiction, the existence of a money-mandating source was uncontested.  *See Perry v. United States*, 149 Fed. Cl. 1, 12–13 (2020), *aff'd*, No. 2020-2084, 2021 WL 2935075 (Fed. Cir. July 13, 2021); *Gulley v. United States*, 150 Fed. Cl. 405, 416 (2020); *cf. Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008) ("It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.").

suggestion programs, including those promulgated under 5 U.S.C. § 4503, have reached the same conclusion: submission of a suggestion pursuant to guidelines offering rewards may create an implied-in-fact contract, depending on the precise language of the rules. *See, e.g.*, *Cooley*, 76 Fed. Cl. at 557 (finding implied contract from SSA's § 4503 program); *Anderson v. United States*, 73 Fed. Cl. 199, 204 (2006) (collecting cases); *Griffin v. United States*, 215 Ct. Cl. 710, 714 (1978) (finding implied contract for military suggestion award program created under 10 U.S.C. § 1124). Indeed, the *Monzo* court cited several of these cases on its way to concluding that the SSA's Personnel Manual for Supervisors can be construed as money-mandating. *See* 2013 WL 6235608, at \*2 (discussing *Cooley* and *Anderson*). The foundation for this conclusion, however, is necessarily undercut by the Federal Circuit's subsequent holding in *Acevedo* that only policies "akin to formal agency rules or binding written directives" may form the basis of a money-mandating regulation. 824 F.3d at 1370. Only where compensation is mandated by a "source of substantive law" does the Court have jurisdiction. *Mitchell*, 463 U.S. at 218. *Monzo* is therefore an outlier, and the Court will not follow its analysis.

Crestview thus bears the burden of identifying a "source of substantive law" mandating compensation to establish jurisdiction over Count IV. Because the parties appear to agree that the UIP Funding Laws are not money-mandating, *see* Resp. at 26, and because the UIP T&C, UIP FAQs, and other informal training materials, *see* Compl. ¶ 77, plainly do not meet this definition—and Crestview does not argue otherwise—Crestview has not identified a money-mandating source. The Court therefore must dismiss Count IV for lack of subject matter jurisdiction.[7]

## II.    The Court Denies the Motion to Dismiss Counts I–III of the Complaint for Failure to State a Claim.

### A.    The Court Excludes from Consideration Certain Documents in the Motion's Appendix Pursuant to Rule 12(d).

Attached to the United States' Motion is a 137-page Appendix. The Appendix consists of nine exhibits: the UIP FAQs, App'x at A1–A29; the HRSA Webinar, *id.* at A30–A62; three sets of UIP T&C from 2020 through 2022, *id.* at A63–A97; sample attestations, *id.* at A98–A99; HRSA's standard operating procedure from February of 2022, *id.* at A100–A103; a letter from HRSA to Crestview dated March 18, 2022, *id.* at A104–A105; and HRSA's UIP Assessment Report for Crestview, *id.* at A106–A137. Before the Court can proceed, it must first determine whether these exhibits may be considered on a Rule 12(b)(6) motion to dismiss.

If "matters outside the pleadings are presented to and not excluded by the court" in a Rule 12(b)(6) motion, the Court generally must convert it into a motion for summary judgment.

---

[7] The United States' Motion only argues subject matter jurisdiction as to Count IV. *See* Mot. at 19. The remainder of its arguments against Counts I–III, Crestview's contract-related claims, arise under Rule 12(b)(6). The Court is generally satisfied that Crestview has raised "a nonfrivolous allegation of a contract or an implied-in-fact contract" for jurisdictional purposes. *Peanut Wagon, Inc. v. United States*, 167 Fed. Cl. 577, 593 (2023). The Court therefore analyzes the sufficiency of Crestview's contract-related allegations under Rule 12(b)(6).

RCFC 12(d). However, the Court is "not limited to the four corners of the complaint," and in addition to any exhibits attached to the complaint, it "may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record.'" *Dimare Fresh*, 808 F.3d at 1306 (cleaned up). A document is typically not "incorporated by reference" through a single mention in passing; instead, that designation is for situations where "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged)," which then "effectively merges into the pleadings." *Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 262 (2013) (quoting *Perry v. New England Bus. Serv., Inc.*, 347 F.3d 343, 345 n.2 (1st Cir. 2003)); *see also van Leeuwen v. United States*, 176 Fed. Cl. 503, 506 n.2 (2025) (finding documents incorporated by reference where "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claims" (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1005 (9th Cir. 2018))).

Crestview argues that the Court should exclude from consideration the March 18, 2022, letter from HRSA to Crestview regarding claim reimbursement, and the Assessment Report dated April 15, 2024, as matters "outside the four corners of Plaintiff's Complaint." Resp. at 10. Crestview does not dispute the authenticity of those documents, although it contends that neither is subject to judicial notice nor incorporated by reference. *See id.* Crestview does not directly challenge any other documents. The United States counters that "Crestview's complaint repeatedly discusses the 'pause' that HRSA imposed on the processing of Crestview's claims and the communications surrounding that 'pause,'" which Crestview pleads "as an allegation of breach." Reply at 2. The United States also argues the Assessment Report "features prominently in Crestview's complaint," and therefore both documents are "incorporated by reference or integral to the claim." *Id.* And yet, the United States acknowledges that "neither document is necessary" for the Court's resolution of the instant Motion. *Id.*

First and foremost, the March 18, 2022 letter, App'x at A104–A105, must be excluded. Nowhere in the Complaint is that letter mentioned. Rather, Crestview identifies several other specific communications with HRSA, including "a letter dated April 20, 2022," Compl. ¶ 34, and a response from August 18, 2022, *id.* ¶ 38, among others. Merely because Crestview alleges HRSA's "pause" constitutes a breach, *see id.* ¶¶ 30–31, 52, does not mean all documents related to the alleged breach may be considered at this stage. The United States cites no authority[8] for such an expansive loophole to the rule that courts must "primarily consider the allegations in a complaint" on a motion to dismiss for failure to state a claim. *Dimare Fresh*, 808 F.3d at 1306. The United States argues no other exception to Rule 12(d). Such communications are clearly relevant and discoverable, and likely would make appropriate exhibits to a motion for summary judgment. But because the letter is not mentioned in the Complaint, much less incorporated by reference, the Court must exclude it from consideration at this stage.

---

[8] Aside from *Dimare Fresh*, 808 F.3d at 1306, the United States also cites *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325–26 (Fed. Cir. 2016), for the general rule. *See* Reply at 1–2. But *Rocky Mountain* involved documents attached to the complaint, 841 F.3d at 1325–26, as opposed to those incorporated by reference, and therefore does not support the United States' argument beyond supplying a restatement of the basic rule.

The Assessment Report, App'x at A106–A137, however, is a somewhat closer call. Crestview does specifically reference that document in its Complaint. *See* Compl. ¶ 45 ("HRSA did not issue its final Assessment report until April 15, 2024 . . . ."). Crestview further alleges that HRSA's decision to delay issuing that report until after the UIP Cut-Off Date constitutes a breach of the implied covenant of good faith and fair dealing. *See id.* ¶¶ 70–72. However, Crestview clarifies the report "is unrelated to paused unpaid claims" asserted here, *id.* ¶ 45, and Crestview's claims do not rely on the contents of that report—only the date of issuance is mentioned. *See id.* The United States, again, cites no authority in support of its argument that the document is incorporated by reference. To the contrary, for the purposes of Rule 12(d), courts typically will not find a document to be "incorporated by reference" unless the "factual allegations are expressly linked to—and admittedly dependent upon—a document." *Bristol Bay*, 110 Fed. Cl. at 262 (quotation omitted). A document is incorporated by reference where "the plaintiff refers extensively to the document," *van Leeuwen*, 176 Fed. Cl. at 506 n.2 (quotation omitted), or where the referenced "documents are central to the plaintiff's claim," such as the operative contract in a breach-of-contract case. *Bell/Heery v. United States*, 106 Fed. Cl. 300, 307 (2012), *aff'd*, 739 F.3d 1324 (Fed. Cir. 2014) (quoting *Cnty. of Santa Fe v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002)). Moreover, the United States concedes that the document is unnecessary. *See* Reply at 2. Thus, out of an abundance of caution, the Court also excludes the Assessment Report from consideration.[9]

---

[9] Although Crestview does not object to the other exhibits, the Court observes that, at the very least, the UIP FAQs, the HRSA Webinar, and the UIP T&C, App'x at A1–A97, are referenced multiple times in the Complaint and form the basis of Crestview's contract and money-mandating claims. *See* Compl. ¶¶ 23–24, 27, 74–79. However, the grounds for considering the sample attestations and HRSA's standard operating procedure, App'x at A98–A103, are less clear. Crestview mentions the process of "obtaining patient attestations," Compl. ¶ 28, but not any specific *document*. As for HRSA's standard operating procedure, it is not mentioned in the Complaint or the UIP T&C, and the exhibit contains no indication that the document itself, still labeled "SOP #TBD," App'x at A100, was ever adopted or published on a public government website. Neither exhibit is facially subject to judicial notice, so both exhibits will be excluded. Furthermore, the Court also excludes from consideration the parties' various references to online news articles and nongovernmental websites, *see, e.g.*, Mot. at 10; Resp. at 4–5, and other matters plainly outside the pleadings. To the extent the parties rely on statements from the HHS Office of Inspector General ("OIG"), *see* Mot. at 3 n.1; Resp. at 4 n.1, that audit report is directly cited and quoted in the Complaint. *See* Compl. ¶ 33 & n.4. Neither party offers the full OIG report as an exhibit, nor does the Court rely on those statements for the purposes of resolving the Motion. The United States additionally supplies a chart purportedly showing the status and approximate value for four broad categories of Crestview's claims for reimbursement. *See* Mot. at 12. No citation is offered as the basis for this demonstrative. The United States then appears to quote and rely on statements from Crestview's prior complaint filed in the Central District of California, *see id.* at 12, 22, 34, as opposed to the factual allegations in Crestview's operative Complaint in this Court. The United States never explains how the contents of any of this outside evidence may be considered at this juncture. In the future, Rule 12(d) issues should be addressed *at the outset* whenever attaching exhibits to a Rule 12(b)(6) motion to dismiss.

B. **Crestview Plausibly Alleges All Requirements for Contract Formation.**

The United States moves to dismiss Crestview's claims for breach of an express or implied-in-fact contract primarily on the grounds that "Crestview fails to plausibly allege the formation of such a contract." Mot. at 19. Because the Motion does not meaningfully differentiate between Crestview's claims of express contract and implied-in-fact contract, the Court considers Counts I and II together and need not determine at this juncture whether the alleged contract is express or implied.[10] For the reasons stated below, the Court finds that Crestview has plausibly alleged a contract,[11] and to the extent the United States seeks dismissal for failure to state a claim under Rule 12(b)(6), the Motion is denied.

*1. The Requirements for Contract Formation Are Identical for Both Express and Implied-in-Fact Contracts.*

The basic elements of a contract claim are "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (quotation omitted). Thus, to survive a motion to dismiss, a plaintiff "must allege either an express or an implied-in-fact contract, and the breach of that contract." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Where the underlying fact allegations are not in dispute,

---

[10] Of course, this issue will need to be addressed at some point, as "the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter." *Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 949 (Fed. Cir. 2021) (quoting *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1370 (Fed. Cir. 2018)). However, it is equally well-established that a plaintiff may plead in the alternative or even assert inconsistent claims. *See* RCFC 8(d).

[11] The United States also challenges the sufficiency of Crestview's breach allegations, assuming the UIP T&C created an express contract. *See* Mot. at 28–30. The United States does not extend this argument to Crestview's claim of an implied-in-fact contract. Crestview never squarely responds to this argument, and the United States does not reassert it in reply. Regardless, the United States' argument consists of mostly conjecture regarding disputed timing and contains almost no citation to authority. *See, e.g.*, *id.* at 29 ("If Crestview did not, after attestation, actually complete submission . . . there would be nothing HRSA could even theoretically pay, much less be obligated to pay."). In essence, the United States hypothesizes at what stage Crestview's claims were in the submission process by comparing the UIP T&C with statements from the HRSA Webinar, as opposed to Crestview's allegations. This argument also is dependent upon HRSA's standard operating procedures, App'x at A100–A103, which the Court already excluded from consideration at this stage. Moreover, the effective date for the "SOP #TBD" exhibit is February of 2022, *id.* at A100, long after Crestview alleges that it submitted many of its disputed claims starting in October of 2020. *See* Compl. ¶ 29. Because Crestview has sufficiently alleged that HRSA breached the UIP T&C by refusing to promptly process and reimburse Crestview's claims, thus incurring additional damages, *see id.* ¶¶ 52–54, whether HRSA was justified in its actions is a disputed fact that precludes resolution of this question at the motion-to-dismiss stage.

"contract formation is a question of law." *Id*.  At the motion-to-dismiss stage, a plaintiff need not plead every element of contract formation with specificity—nonetheless, a plaintiff must allege sufficient "facts establishing the existence of a contract with the government." *Harlem Globetrotters Int'l, Inc. v. United States*, 168 Fed. Cl. 31, 37 (2023) (quoting *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1381 (Fed. Cir. 2019)); *cf.* RCFC 9(k) (requiring "substantive provisions of the contract" upon which claim is based to be identified in pleading).

The four general requirements to establish a binding contract with the United States are: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Am. Bankers*, 932 F.3d at 1380–81 (quoting *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003)).  "These requirements apply to both express and implied-in-fact contracts." *Id*. at 1381.  However, an implied-in-fact contract differs from an express contract in that each requirement may be "inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)).

The United States challenges all four requirements for contract formation.  *See* Mot. at 19–28.  Crestview responds that it has adequately pleaded mutuality of intent, offer and acceptance, consideration, and authority to contract.  *See* Resp. at 12–26.  The Court will address the parties' arguments on each requirement of contract formation below.

### 2.    *Crestview Plausibly Alleges Mutuality of Intent and Offer and Acceptance.*

"As a threshold condition for contract formation," Crestview must show "an objective manifestation of voluntary, mutual assent" by the United States. *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (quoting *Anderson*, 344 F.3d at 1353).  "The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." *Anderson*, 344 F.3d at 1353 (quoting Restatement (Second) of Conts. § 22(1) (A.L.I. 1981) (hereinafter "Restatement")).  The offer or acceptance cannot be ambiguous.  *See id*.  When considering mutuality of intent with regards to implied-in-fact contracts, "the nature of the evidence showing this intent will differ," and "courts will infer a meeting of the minds from the conduct of the parties, rather than from their express words." *Peninsula Grp. Cap. Corp. v. United States*, 93 Fed. Cl. 720, 728 (2010) (citing *Balt. & Ohio*, 261 U.S. at 597).  Mutual intent can be shown through circumstantial evidence, including administrative "correspondence, memoranda," and other types of "documentary proof." *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1366 (Fed. Cir. 2005).

Crestview alleges that it "entered into a contract with HRSA" when it accepted the UIP T&C.  Compl. ¶ 23.  The alleged contract involved an exchange of promises—including that Crestview would provide testing services to individuals it certified "to the best of its knowledge" as having "no health care insurance coverage," and in exchange Crestview would accept UIP "reimbursement as payment in full" without balance billing the patient. *Id*. ¶ 24.  HRSA confirmed these mutual obligations and the reimbursement process through the UIP FAQs and

the HRSA Webinar.  *Id.* ¶ 27.  It is hornbook law that an offer may be accepted by performance or by a return promise "that the offeree complete every act essential to the making of the promise."  Restatement § 50; *cf. Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 n.9 (Fed. Cir. 2004) ("The Restatement of Contracts is recognized as an appropriate source of authority in contract cases.").  By attesting to the UIP T&C, Crestview manifested its assent by promising to abide by those restrictions in exchange for HRSA's promise of reimbursement.  *See* Restatement § 50 cmt. c ("The typical contract consists of mutual promises and is formed by an acceptance constituting a return promise by the offeree.").  Such factual allegations are more than sufficient to satisfy the basic requirements for offer, acceptance, and mutuality of intent to contract.[12]  As the Court recently reasoned in *Laborant*, the UIP "operated as an offer by HRSA to reimburse health care providers at Medicare rates under the Program's Terms and Conditions," and providers "accepted the offer by affirmatively agreeing to the Terms and Conditions, performing covered services, and submitting timely claims for reimbursement."  180 Fed. Cl. at 85.

The UIP T&C provided in the United States' Appendix generally confirm Crestview's allegations.  *See* App'x at A75–A85.  Among other provisions, the UIP T&C state: "The Secretary will reimburse the Recipient generally at 100 percent of Medicare rates" for eligible services rendered "for which the Recipient submits claims to the [UIP] Fund unless otherwise noted."  *Id.* at A78.  The UIP T&C further clarify that "each claim must be in full compliance with these [T&C]" at the time of submission, "submission of those claims confirms the Recipient's ongoing compliance with these [T&C]," and "the Recipient's full compliance with all [T&C] is material to the Secretary's decision to disburse funds to the Recipient."  *Id.* at A76. Crestview thus points to the UIP T&C as "an unambiguous 'offer'" that it "accepted by agreeing to the UIP [T&C] during registration" and by complying with those obligations throughout its participation in the COVID-19 UIP.  Resp. at 14.

Crestview also argues that "mutuality of intent to contract can be established by the surrounding factual circumstances."  *Id.* at 12.  This includes the fact that Crestview had been participating in the COVID-19 UIP since November of 2020, and HRSA had reimbursed Crestview for its submitted claims without issue for almost two years.  *See* Compl. ¶ 23; Mot. at 1 ("Crestview directly benefitted from this assistance fund, receiving close to $100 million in reimbursed claims.").  Even the rationale provided for HRSA's pause of payments was "to determine compliance with the [T&C]" and related laws.  Compl. ¶ 38.  The conduct of the

---

[12] Indeed, the attestation process for the UIP T&C and the online claims-submission portal that Crestview describes, *see* Compl. ¶ 58, bear all the indicia of a classic clickwrap contract.  *See generally Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (describing typical "clickwrap" agreement where "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed," further noting that "courts have routinely found clickwrap agreements enforceable").  This is particularly evident from the sample attestations, which consist of a series of checkboxes including a link to the UIP T&C.  *See* App'x A98–A99.  However, neither party briefs this issue, and the Court declines to rely on the sample attestations at this stage.  The Court additionally observes that the Federal Circuit does not appear to have squarely addressed the enforceability of clickwrap agreements created *by* federal agencies *against* the United States.

parties amply confirms that both acted in accordance with the UIP T&C and expected the other to comply with their mutual obligations. *See Hanlin*, 316 F.3d at 1328. Reading the allegations in the light most favorable to Crestview, Crestview has more than adequately pleaded mutual intent to contract.

In addition, the line of cases Crestview relies on for its money-mandating arguments—although unpersuasive for that purpose—lend further support to Crestview's argument that an implied-in-fact contract existed. This Court has routinely found that implied-in-fact contracts may arise from employee-suggestion programs that offer incentive awards to employees who make suggestions that the agency adopts. *See, e.g.*, *Cooley*, 76 Fed. Cl. at 557; *Anderson*, 73 Fed. Cl. at 204; *Griffin*, 215 Ct. Cl. at 714. Those cases reflect the principle that "actions taken in accord with and reliance upon agency procedures may give rise to an implied-in-fact contract that incorporates those internal procedures." *Cooley*, 76 Fed. Cl. at 557.

In a related context, the Federal Circuit addressed whether an implied-in-fact contract arose from a federal program "where individuals or businesses could submit bent or partial coins to the U.S. Mint in exchange for payment." *Portland Mint v. United States*, 102 F.4th 1371, 1375 (Fed. Cir. 2024). The agency set forth this coin-redemption program in detailed regulations, where it also reserved the right to test submitted coins and refuse redemption in certain situations, such as if the agency discovers counterfeits in a sampling. *See id.* at 1376. Portland Mint participated in the program without issue for several years. *See id.* When the U.S. Mint paused reimbursements and ultimately rejected a shipment upon finding counterfeits mixed in with genuine coins, Portland Mint sued for breach of contract. *See id.* at 1377. The Federal Circuit first considered the question whether the coin-redemption program created an implied-in-fact contract. *See id.* at 1378. Reviewing prior decisions finding implied-in-fact contracts from regulations, such as those for eliciting submission of uranium shipments or suggestions from employees, *see id.* at 1378–79 (citing *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 406 (Ct. Cl. 1957); *Griffin*, 215 Ct. Cl. at 714), the Federal Circuit concluded: "The regulation acted as an offer, and if a party submitted qualifying coins to the U.S. Mint, it was an acceptance, and an implied-in-fact contract was created." *Id.* at 1379. Integral to this conclusion was regulatory language "set[ting] forth conditions" for redemption and stating that "[a]ny submission under this subpart shall be deemed an *acceptance* of all provisions of this subpart." *Id.* at 1379 (emphasis added).

*Portland Mint*, not cited by either party, appears to provide a close parallel to the facts of this case. Not only must providers attest to the UIP T&C to participate in the COVID-19 UIP, *see* App'x at A18–A19, A37, but the UIP T&C set forth detailed terms and conditions for participating in the program. *See id.* at A75–A85. The UIP T&C even state at the outset that the participating healthcare provider "attest[s] to the following [T&C]" and "agrees to comply with any other applicable statues and regulations." *Id.* at A75. Consequently, under *Portland Mint*, it is more than plausible to view the UIP T&C as an offer by the United States, and Crestview's attestation to follow the UIP T&C, participation in the COVID-19 UIP, and submission of claims for reimbursement—again, construed in Crestview's favor—as an acceptance, thereby forming an implied-in-fact contract, if not an express contract through the UIP T&C.

The United States' arguments to the contrary are unpersuasive.  The United States argues that "HRSA was inviting healthcare providers generally to submit applications that *if approved*, and funds were available, could result in payment."  Mot. at 20 (emphasis in original).  In support, the United States relies on *Sin Hang Lee v. United States* for the proposition that "mere solicitations, invitations, or instructions from the government are not offers to contract that can bind the government."  142 Fed. Cl. 722, 731 (2019), *aff'd*, 819 F. App'x 908 (Fed. Cir. 2020).  But the "offer to contract" alleged in *Lee* was a government official's "public statement to a conference audience" by telephone that he was "looking forward to seeing a greater utilization of [polymerase chain reaction ("PCR") DNA testing] as a diagnostic tool in the future."  *Id*.  The *Lee* court understandably concluded that such a generalized statement "suggests no more than a desire, or a general willingness, to see a greater utilization of PCR as a diagnostic tool," and "does not contain a promise from the [agency]" to do anything.  *Id*.  This is a far cry from the unambiguous promise of reimbursement in the UIP T&C here.  *Lee* is wholly inapposite.

The United States next relies on *Linear Technology Corp. v. Micrel, Inc.*, for the general rule that: "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."  275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting Restatement § 26).  But *Linear* is also factually distinguishable, as the alleged "offer" in that case consisted of "internal communications between [the plaintiff] and its sales representatives soliciting information on pricing."  *Id*.  Although "at least one sales representative spoke to potential customers in order to help [the plaintiff] determine an appropriate price," evidence showed that the sales representatives "merely sought 'good input from users to see what they feel it's worth.'"  *Id*.  The *Linear* court thus found "[n]o reasonable customer could interpret such a request for information, barren of any other terms, as an offer to which [the plaintiff] could be bound."  *Id*.  That is hardly the situation here—not only did HRSA communicate a price for the services, i.e., "100 percent of Medicare rates," App'x at A78, the UIP T&C detail at length the types of services that will be reimbursed and the limitations imposed on participating healthcare providers.  *See id*. at A75–A85.  The UIP FAQs and the HRSA Webinar serve to further clarify what is expected of participants and how the claim-submission process works.  *See id*. at A1–A62.  These were not internal communications.  HRSA was not merely reaching out to healthcare providers to inquire whether they would be interested in providing COVID-19 testing services to uninsured individuals.  HRSA created and oversaw operation of the COVID-19 UIP for almost two years, during which time Crestview participated and was reimbursed for its services until HRSA decided to pause payments in early 2022.  *See* Compl. ¶¶ 9–14.  *Linear* has no bearing here.

Finally, the United States argues that because payment of claims comes after attestation to the UIP T&C, neither act can constitute acceptance of an offer.  Mot. at 21.  This is because the "manifest assent to be bound" necessary to create a contract means "[t]he offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly."  *Anderson*, 344 F.3d at 1357 (quoting *Est. of Bogley v. United States*, 514 F.2d 1027, 1032 (Ct. Cl. 1975)).  The United States thus highlights additional steps that must be taken after claims submission, such as adjudication and "determination of the quantifiable amount due," Compl. ¶ 17, as effectively "preclud[ing] the formation of a contract by HRSA" for reimbursement of claims other than those HRSA already

reimbursed. *See* Mot. at 21–22. In its view, a contract is only formed once the United States accepts a provider's offer of UIP claims and decides to reimburse those claims. *See, e.g.*, *id.* at 29 ("Finally, because Crestview in fact received money from the uninsured program, it was undisputably bound by the terms and conditions with respect to those claims."). But this argument effectively ignores the plain language of the UIP T&C, including obligations imposed on participants to "submit reports," "provide requested documentation," and "not engage in 'balance billing' or charge any type of cost sharing" for services, App'x at A77–A78, that ostensibly apply *even before* any reimbursement is received. Indeed, the UIP T&C warn "that non-compliance with any Term or Condition and all applicable statutes and regulations may result in administrative, civil, and/or criminal action being taken." *Id.* at A78. That HRSA performed additional steps afterward to ensure submitted claims were eligible for reimbursement does not change the essence of the bargain: a promise to abide by the UIP T&C for a promise to reimburse eligible claims. *See Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995) (finding mutual intent to contract where terms and conditions provided "mechanism by which to assure each other's compliance"). There is no ambiguity in offer and acceptance here. The United States' arguments on these requirements are unpersuasive.[13]

### 3.      *Crestview Plausibly Alleges Consideration.*

Consideration can be either "a detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor." *Woll v. United States*, 45 Fed. Cl. 475, 477 (1999), *aff'd*, 251 F.3d 171 (Fed. Cir. 2000) (quoting *Bogley*, 514 F.2d at 1033). Every "contract must be supported by sufficient and valuable consideration," but it is an equally fundamental proposition that "past consideration is no consideration." *Id.* (quoting *Bogley*, 514 F.2d at 1033). "To constitute consideration, a performance or a return promise must be bargained for." *Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (quoting Restatement § 71(1)). A "bargained for" performance or return promise is one that "is sought by the promisor in exchange for his promise." *Steinberg v. United States*, 90 Fed. Cl. 435, 444 (2009) (quoting Restatement § 71(2)). "A detriment to one party may serve as consideration, but only if such detriment is bargained for." *Id.*

Crestview alleges that it invested in equipment and administered countless COVID-19 tests to uninsured individuals without charge, to its detriment, thereby allowing the United States to appropriately respond to a national emergency. *See* Compl. ¶¶ 60–61. HRSA created the COVID-19 UIP and sought to encourage providers to administer COVID-19 testing in exchange for reimbursement, as contemplated by the UIP Funding Laws. *See id.* ¶¶ 5–11. Crestview registered for the COVID-19 UIP, accepted the UIP T&C, and participated in the program for

---

[13] The United States also separately, and confusingly, challenges whether Crestview has plausibly alleged an intent to be contractually bound. *See* Mot. at 25–28. The United States' arguments in this section mimic those on offer and acceptance, except that it largely ignores the UIP T&C and other pertinent facts in the Complaint. Crestview does not directly respond to this section. The Court has already found that Crestview plausibly alleged mutual intent, offer, and acceptance, and the United States cites no authority for any additional requirement necessary for contract formation. Because the hypothetical arguments raised in that section are untethered to the facts alleged the Complaint, the Court declines to address them on a Rule 12(b)(6) motion.

almost two years without issue. *See id.* ¶¶ 12–14. The UIP T&C confirm that HRSA would reimburse the types of COVID-19 testing services Crestview provided. *See* App'x at A75. In exchange for the promise of reimbursement at "100 percent of Medicare rates," participants agreed to accept HRSA's reimbursements as "payment in full" and "not engage in 'balance billing' or charge any type of cost sharing for any items or services." *Id.* at A78. Participants also agreed to take on other obligations, including certifying that the patients lacked other insurance, maintaining records, and submitting reports. *See id.* at A76–A78. By attesting to the UIP T&C, participants opened themselves to the possibility of "fines, civil damages, and/or imprisonment" for any deliberate misrepresentations. *Id*. at A77. Indeed, HRSA reimbursed Crestview for its participation in the program through early 2022. *See* Compl. ¶ 30; Mot. at 1.

Based on those allegations, and the obligations imposed by the UIP T&C, Crestview argues that it "adequately pled consideration as Crestview suffered a detriment (by conducting over a million tests) and the Government received a benefit in that it was able to respond to a national emergency" and "prevent the spread of COVID-19." Resp. at 17. "Crestview was not gratuitously rendering services" for uninsured individuals—the United States "knew, or should have known, that Crestview expected compensations" based on its "participation in the UIP with promises of payment." *Id*. at 21. It is uncontested that Crestview provided the types of testing services HRSA sought to encourage through the COVID-19 UIP. *See* Mot. at 22 ("HRSA hoped the [UIP] would lower the barriers to testing for uninsured individuals and believed that doing so would further its overall public health mission in addressing the pandemic emergency . . . ."); App'x at A75 (defining COVID-19 testing services eligible for reimbursement). Crestview has not only identified a $69 million detriment to itself, *see* Compl. ¶¶ 60–62, but an enormous benefit to the United States that HRSA specifically "bargained for," i.e., "sought . . . in exchange for [its] promise" of reimbursement, *Steinberg*, 90 Fed. Cl. at 444 (quotation omitted), through the UIP T&C and the program writ large. Construing the pleadings in its favor, the Court agrees that Crestview has more than adequately pleaded consideration under these circumstances. *See Laborant*, 180 Fed. Cl. at 86.

Nevertheless, the United States argues that it derived no *direct* benefit from Crestview's participation in the COVID-19 UIP, as "the testing services were provided to the *uninsured*, *not* to HRSA; and Crestview's participation in the [UIP] was a benefit *to Crestview* (to the tune of $100 million), *not* HRSA." Mot. at 22 (emphasis in original). The United States insists that "Crestview suffered no detriment '*at the request of*' HRSA," because "HRSA had no control over whether Crestview performed any tests." Reply at 11 (emphasis in original). And because "Crestview's performance of the tests had to be complete and fully performed *before* it could submit a claim for reimbursement," no contract was formed as "past consideration is no consideration." *Id*. (emphasis in original) (quoting *Bogley*, 514 F.2d at 1033). The Court has already rejected the United States' premise that Crestview's submission of claims was the operative offer—the UIP T&C plainly contradict that view. Instead, because Crestview must agree to the UIP T&C before submitting claims for reimbursement, and "full compliance" with the UIP T&C is deemed "material" to reimbursement, App'x at A76, HRSA bargained for Crestview's compliance and future performance. The United States cannot ignore the UIP T&C.

The United States next relies on *City of El Centro v. United States*, 922 F.2d 816 (Fed. Cir. 1990), for the premise that Crestview's testing services cannot constitute consideration

where "HRSA was not required to provide testing services for the uninsured" as a matter of law. Mot. at 23. In *El Centro*, a hospital sought payment for emergency medical services rendered to individuals who suffered injuries while attempting to flee from Border Patrol agents. 922 F.2d at 817. The hospital grounded its implied-in-fact contract claim on a statute, which provides that "any person detained by the [agency] *may* be treated and cared for." 922 F.2d at 822 (emphasis in original) (quoting 42 U.S.C. § 249(a)). However, the Federal Circuit concluded that because the individuals were not "detained" while hospitalized, that law did "not provide authority for, much less create responsibility in, the Government to provide care." *Id.* at 823. Because the agency "was not required to provide care" under those circumstances, the hospital's services did not benefit the agency, and "the Government received no consideration to support an implied-in-fact contract." *Id*.

The Court need not dwell long on *El Centro*. Crestview is not relying solely on a statute to undergird its contract claim—Crestview's contract claims are additionally premised on the UIP T&C, the UIP FAQs, UIP Process Training documents, and the conduct of the parties *over almost two years*. *See* Compl. ¶¶ 23–28. Those types of circumstantial evidence supporting a bargained-for exchange of promises were largely absent from *El Centro*. There is no dispute that the UIP Funding Laws are discretionary. But those appropriation statutes, such as the CARES Act, directed the Secretary of HHS "to reimburse through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." 134 Stat. at 563. The CARES Act further states that the Secretary of HHS "shall, on a rolling basis, review applications and make payments under this paragraph," and "payments under this paragraph shall be made in consideration of the most efficient payment systems practicable to provide emergency payment." *Id.* As Crestview alleges, this formed the basis of the COVID-19 UIP. *See* Compl. ¶¶ 7–11. Unlike the agency in *El Centro*, HHS and HRSA were not only authorized but *commanded* to use the appropriated funds to reimburse healthcare providers like Crestview for their COVID-19 testing and other related services. More importantly, as noted above, the consideration here is not each individual test but Crestview's participation in the COVID-19 UIP and ongoing compliance with the UIP T&C. *El Centro* is inapplicable where Crestview has identified return promises beyond the authorizing statute. *Accord Laborant*, 180 Fed. Cl. at 87 (finding *El Centro* "inapposite" when rejecting the United States' contention that HHS and HRSA received no benefit from the COVID-19 UIP).

Finally, the United States relies on *St. Bernard Parish Government v. United States*, 134 Fed. Cl. 730 (2017), *aff'd*, 916 F.3d 987 (Fed. Cir. 2019), which it describes as "on all fours with the situation here." Mot. at 24. *St. Bernard* involved a cooperative agreement "for the removal of sediment . . . in the aftermath of Hurricane Katrina." 134 Fed. Cl. at 732. Under the terms of that agreement, the Parish was obligated "to contract for the watershed improvements, pay the contractors, and . . . dispose of any and all contractual disputes," and the agency agreed to pay "*actual* costs," up to around $4.3 million, and only after the Parish "provide[d] records to support costs incurred." *Id.* at 732–33 (emphasis in original). When the agency refused to reimburse the full amount requested, the Parish filed suit for breach of contract. *See id.* at 734. However, the *St. Bernard* court found no consideration, which "must render a benefit to the government, and not merely a detriment to the contractor" for purposes of a government contract. *Id.* at 735 (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987)). Because the agency "did not receive a direct benefit" from the cooperative agreement, it was "not an

enforceable contract in this Court." *Id*.  The United States thus argues that because "HRSA received no *direct* benefit" from the COVID-19 UIP, Crestview's participation in that program cannot support consideration.  Mot. at 24.

However, central to *St. Bernard*'s reasoning was the fact that the alleged contract was a cooperative agreement under 31 U.S.C. § 6305, and it is well-established that "cooperative agreements, unlike procurement contracts, are not presumed to provide money damages."  134 Fed. Cl. at 734.  Indeed, the cooperative agreement by its own terms expressly barred money damages for breach.  *See id.* at 735.  Because "[t]he entire purpose of a cooperative agreement is to transfer a thing of value *to* the local government *from* the executive agency," much like a gift, the *St. Bernard* court rejected the Parish's argument that mere "incidental benefit to the government" could be consideration.  *Id*. at 736 (emphasis in original).  The United States does not argue the UIP T&C qualify as or were intended to operate as a cooperative agreement under 31 U.S.C. § 6305.  The Court declines to extend *St. Bernard* beyond the narrow context of cooperative agreements.

### 4.    *Crestview Plausibly Alleges a Government Representative with Actual Authority on Behalf of the Government Entered into the Contract.*

Even after establishing the basic requirements for contract formation, to create a contract *enforceable* against the United States, "the plaintiff must allege facts sufficient to show that the government representative who entered into or ratified the alleged contract was authorized to bind the United States to the agreement in question."  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  But at the motion-to-dismiss stage, the plaintiff need not "identify and plead the particular person who approved the contractual arrangement" or "the particular statute or regulation that authorized that person to commit the government in contract."  *Id.* at 1380.  Instead, it is generally "sufficient for the complaint to allege that the Government's promise was authorized by a person having legal authority to do so."  *Id.*  "Authority to bind the government is generally implied when such authority is considered to be an integral part of the duties assigned to a government employee."  *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (cleaned up), *as amended on reh'g* (Dec. 11, 1989).

Crestview does not identify a specific government representative in the Complaint. Instead, Crestview alleges in generic terms that its contract with HRSA "was authorized by representatives of the Agency who had actual authority to bind the United States."  *See* Compl. ¶ 59.  The United States thus argues that dismissal is appropriate for failure to plausibly allege "anyone with actual authority" to contract on behalf of HRSA committed the United States to pay Crestview's claims for reimbursement.  Mot. at 25.  Crestview counters that actual authority "is a question of fact which cannot be resolved in the Government's favor at the pleading stage." Resp. at 22 (citing *Leonardo v. United States*, 60 Fed. Cl. 126, 128 (2004)).  Nonetheless, for purposes of its opposition, Crestview contends that, construed liberally, the Complaint identifies then-Secretary of HHS Xavier Becerra.  *See id.* at 22–24.  The United States, on some level, concedes "there is no dispute that the Secretary [of HHS] authorized the existence of the UIP and exercised his discretion to allocate funding to that program."  Reply at 17.

19

The Court agrees that a general allegation of authority, liberally construed, is sufficient to survive the pleading stage. *See Sommers Oil*, 241 F.3d at 1378. Nor is Crestview's argument regarding Secretary Becerra wholly unfounded. Crestview alleges that "the CARES Act and subsequent statutes tasked the Secretary of HHS with reimbursing . . . eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." Compl. ¶ 10 (cleaned up). To fulfill the purposes of the UIP Funding Laws, HHS and HRSA "established the COVID-19 UIP to provide claims reimbursement to eligible health care providers for testing uninsured individuals for COVID-19." *Id*. ¶ 9. Indeed, the UIP T&C state that "[t]he Secretary [of HHS] will reimburse the Recipient" for submitted claims. App'x at A78. Participating healthcare providers must acknowledge that "full compliance with all Terms and Conditions is material to *the Secretary's* decision to disburse funds." *Id*. at A76 (emphasis added). There is no real dispute that the Secretary of HHS had implied actual authority to direct reimbursements, thereby binding the United States, under the relevant UIP Funding Laws. *See* CARES Act, 134 Stat. at 563; *cf. Loc. Initiative Health Auth. for L.A. Cnty. v. United States*, 142 Fed. Cl. 1, 18 (2019) (finding Secretary of HHS had implied actual authority to contract under provisions of Affordable Care Act).

Nor does it appear that Crestview was dealing with any single contracting officer when submitting claims for reimbursement. Instead, Crestview submitted its claims through an online portal. *See* Compl. ¶¶ 14, 58; App'x at A45–A57 (outlining online registration and submission process). Crestview alleges that the Secretary of HHS delegated his authority to HRSA for operating the COVID-19 UIP, and that HRSA further contracted with UnitedHealth to pay—and in this case recoup—reimbursements. *See* Compl. ¶¶ 13, 26–31, 48. The United States does not dispute these allegations or otherwise imply that any delegation of authority to HRSA was improper. *See, e.g.*, Mot. at 4 (noting UnitedHealth assisted with UIP administration but "claim adjudication policies remained within HRSA's sole control"). More importantly, Crestview *was* initially paid for at least a portion of its claims disputed here, *see* Compl. ¶ 30, and the United States even concedes Crestview received almost $100 million from HRSA through its participation in the COVID-19 UIP. *See* Mot. at 3. This fact alone confirms that some governmental official somewhere within HRSA had authority to contract on behalf of the United States for reimbursement claims submitted through the online portal. *Cf. Hanlin*, 316 F.3d at 1328 (noting courts may rely on the parties' conduct to establish requirements for implied-in-fact contracts). The United States does not argue that HRSA and UnitedHealth acted *ultra vires* by creating and operating this online portal. Discovery will be necessary to further clarify HRSA's procedure for processing claims and the facts leading up to the pause on Crestview's claims.

Liberally reading Crestview's Complaint and construing all reasonable inferences in its favor, Crestview has plausibly alleged that government representatives with legal authority to bind the United States were involved in the COVID-19 UIP claims-submission process. *See Laborant*, 180 Fed. Cl. at 88–89. The parties dispute specifics of the claims-submission process, but such disputed facts cannot be resolved on the pleadings alone. *See Leonardo*, 60 Fed. Cl. at 128. Because Crestview has plausibly alleged sufficient facts to support an inference that all requirements for contract formation have been satisfied, Crestview's contract claims may proceed.

**C.    The Court Will Allow Crestview's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing to Proceed.**

The United States additionally moves for dismissal of Count III of the Complaint, which asserts a claim for breach of the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement § 205). Thus, for Crestview to have an actionable claim, all requisite elements of a contract must exist. *See Milton v. United States*, 806 F. App'x 996, 1000 (Fed. Cir. 2020) ("Absent a contract, [a] claim of breach of an implied duty of good faith and fair dealing is unsustainable."). To state a claim, "a party generally must allege a 'subterfuge' or 'evasion,'" beyond "a simple breach of contract," such as one party's "interference with or failure to cooperate in the other party's performance." *Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 596 (2013) (cleaned up) (quoting Restatement § 205).

Crestview alleges that the United States breached the implied covenant because HRSA "acted in a way that was designed to injure or destroy Crestview's rights . . . by failing to timely remit payment for valid UIP claims." Compl. ¶ 71. Specifically, Crestview alleges HRSA "intentionally delay[ed]" its Assessment until 2024 "to avoid paying Crestview for COVID-19 UIP testing services rendered." *Id.* ¶ 72. The United States primarily argues[14] that this claim is untenable simply because there is no contract to breach. *See* Mot. at 30–31. Crestview does not squarely address the United States' arguments on Count III aside from disputing whether the Complaint contains sufficient factual allegations to satisfy the requirements for contract formation. *See* Resp. at 11. The United States thus insists "Crestview presents no argument defending those allegations [in Count III], thereby conceding their dismissal." Reply at 3 (citing *Phil. Auth. for Indus. Dev. v. United States*, 114 Fed. Cl. 519, 527–28 (2014)).

First, the Court declines to entertain the United States' suggestion that Count III should be dismissed for an alleged lack of adequate briefing. The thrust of the United States' argument was "that Crestview did not have a contract with HRSA," so Count III should be dismissed "for the reasons stated throughout this motion." Mot. at 30. By responding to the United States' arguments against contract formation, Crestview adequately preserved its claim for breach of the implied covenant. Second, the Court has already found that Crestview plausibly alleged an express or implied-in-fact contract. And Crestview's allegations under Count III go beyond

---

[14] The United States additionally argues that "Crestview's specific allegations of breach seek to 'fundamentally alter the parties' intended allocation of burdens and benefits.'" Mot. at 31 (quoting *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019). But the United States only challenges certain theories of breach, which is premature at this early stage. The United States also contends HRSA merely "followed its standard operating procedures for placing providers on hold" during an audit. *Id*. The United States cites no paragraph of the Complaint for support. The Court has already excluded the standard operating procedures, App'x at A100–A103, from consideration under Rule 12(d). Nor has Crestview conceded that HRSA complied with its stated procedures at the time it implemented the pause—this is only one of many facts in dispute at this early stage. The United States' continued reliance on facts outside the Complaint is improper in the context of its Rule 12(b)(6) arguments.

21

simply restating its breach-of-contract claim by asserting HRSA intentionally delayed its Assessment and release of the final report to injure Crestview. *See* Compl. ¶¶ 69–72. Crestview further alleges a series of communications with HRSA where its agents repeatedly refused to supply information on the Assessment and represented, inaccurately, that the final report was forthcoming. *See id.* ¶¶ 34–41. It was not until 2024, several months after Crestview initially filed suit in California, that HRSA provided its preliminary findings. *See id.* ¶ 44. At the motion-to-dismiss stage, these allegations are more than sufficient to state a claim for breach of the implied covenant of good faith and fair dealing. The United States' arguments for dismissal of Count III, *see* Mot. at 30–31, are premature and unpersuasive without the benefit of discovery.

D.      **The Fiscal Responsibility Act Does Not Extinguish Crestview's Claims.**

Finally, the United States argues that, even if Crestview has alleged sufficient facts to plausibly state a claim, passage of the FRA has extinguished any right to recover Crestview may have had under Counts I–III. *See* Mot. at 31. As previously noted, the FRA rescinded all "unobligated" funds under the UIP Funding Laws as of June 3, 2023. *See* 137 Stat. at 23–25. Because Crestview's disputed claims were never reimbursed, the United States therefore insists "there is no dispute that HRSA did not obligate or remit payment to Crestview on any of the other claims at issue." Mot. at 22. But no allegation from the operative Complaint is cited for this proposition, and the United States provides no definition of the term "obligate." The FRA also contains no definition of the term "obligated" or "unobligated," despite using those terms repeatedly. *See* 137 Stat. at 23–30.

Rather, in the operative Complaint, Crestview alleges repeatedly that the $69 million in unpaid reimbursement claims were "obligated" at the time HRSA paused payments to Crestview. *See, e.g.*, Compl. ¶¶ 18, 29, 33. The United States apparently assumes "obligated" means "actually adjudicated and approved." Mot. at 34. No authority is cited for this argument.[15] But the UIP T&C plainly state: "The Secretary *will reimburse* the Recipient generally at 100 percent of Medicare rates . . . for the items and services . . . provided to Uninsured Individuals for which the Recipient *submits claims* to the Uninsured Program Fund unless otherwise noted." App'x at A78. The UIP T&C can plausibly be read as stating that the submission of claims is the only act necessary to obligate reimbursement. Obligated funds are outside the scope of the FRA's

---

[15] The United States cites a handbook definition of "Deobligation" as meaning: "An agency's cancellation or downward adjustment of previously incurred obligations." Mot. at 34 (quoting U.S. Gov't Accountability Off., Pub. No. GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process 44 (Sep. 1, 2005) ("GAO Glossary")). However, that same handbook defines "Obligated Balance" as: "The amount of obligations already incurred *for which payment has not yet been made*. Technically, the obligated balance is the *unliquidated obligations*." GAO Glossary at 71 (emphasis added). In the appendix, the GAO Glossary further explains: "Obligations are recorded when the federal government . . . awards a contract, receives a service, or enters into transactions *that will require payments in the same or a future period*." *Id.* at 160. Even assuming the GAO Glossary is applicable here, those definitions ultimately do not support the United States' arguments.

recission.  *See Laborant*, 180 Fed. Cl. at 89.  At this early stage, that is sufficient to overcome the United States' arguments, and the United States has cited no authority to the contrary.

The United States also relies on *Greenlee County v. United States* for the proposition that, "in the contract context, the 'subject to the availability of appropriations' language means that the government is not contractually bound except to the extent that appropriations are available." 487 F.3d 871, 878 (Fed. Cir. 2007) (quoting *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 643 (2005)).  But *Greenlee* did not involve a contract, and the Federal Circuit expressly acknowledged that because it was considering "a benefits program not a contract, . . . 'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." *Id*. at 879 (quoting *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1355 (Fed. Cir. 2005)).  This is because in the context of a contract claim, "the presence of sufficient unrestricted lump-sum appropriations (not specifically appropriated for the program in issue) to meet the government's contractual obligation qualifie[s] as available appropriations." *Id.* at 880 n.3 (citing *Cherokee Nation*, 543 U.S. at 641).  Indeed, any other "interpretation would undo a binding governmental contractual promise.  A statute that retroactively repudiates the Government's contractual obligation may violate the Constitution." *Cherokee Nation*, 543 U.S. at 646.  Even assuming the alleged contract here contained the requisite disclaimer,[16] the United States does not argue that HHS lacks unrestricted appropriations with which it could satisfy Crestview's claims.  Indeed, Crestview argues "the amounts due and owing to Crestview are obligated, have not been repealed and can and should be paid, if necessary, from the Judgment Fund." Resp. at 4.  The United States' reliance on *Greenlee* is unpersuasive.

Moreover, Crestview's claim for breach of the implied covenant of good faith and fair dealing remains viable.  And as the Federal Circuit has explained:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch. First, the government enters into a contract that awards a significant benefit in exchange for consideration.  Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract.  The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

*Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010) (citations omitted).  Crestview alleges that HRSA intentionally delayed its Assessment until after the UIP

---

[16] The United States notes that HRSA "reiterated that any reimbursement would be subject to the availability of funds" in certain "public statements." Mot. at 19.  Indeed, the UIP FAQs and HRSA Webinar both contain language indicating that claims would only be reimbursed "subject to available funding." App'x at A3, A31–A60.  However, that language is noticeably absent from the UIP T&C. *See id.* at A75–A85.  The question whether that language has been incorporated into the contract is not before the Court, as discovery will be necessary before contract interpretation is possible.

Cut-Off Date and even after passage of the FRA to avoid paying Crestview's reimbursement claims. *See* Compl. ¶ 72. Thus, the subsequent recission of funding through the FRA may *itself* serve as the basis for a breach of implied covenant claim where the United States has already reaped the benefit of the COVID-19 testing services Crestview provided. For those reasons, the Court concludes that the FRA does not necessarily exterminate Crestview's claims.

## CONCLUSION

For the foregoing reasons, the Court finds that Crestview has plausibly alleged an express or implied-in-fact contract with the United States, as well as a breach of the implied covenant of good faith and fair dealing in Counts I–III of the Complaint. However, Crestview has failed to identify a money-mandating source of substantive law to support Count IV. Accordingly, the Court hereby **GRANTS IN PART** the United States' Motion to Dismiss, ECF No. 12, to the extent it seeks dismissal of Count IV under RCFC 12(b)(1). In all other respects, the Court **DENIES** the Motion as it pertains to Counts I–III.

**IT IS SO ORDERED.**

_____
ROBIN M. MERIWEATHER
Judge

24